Yes, I would like to move the admission of Taylor King. He is a member of the Bar and is in good standing with the highest court of the state of California. I have knowledge of his credentials and am satisfied that he possesses the necessary qualifications. In fact, I have pretty detailed knowledge of his credentials and qualifications because he has been serving as my law clerk for the last year. Taylor was brought to our attention and we were brought to his attention through one of my former law clerks who was a good friend and classmate of Taylor's. We lobbied Taylor to leave his cushy, high-paying job at Gibson Dunn in California and to move his whole family across country in order to join us. We are very happy that we were able to convince him to do that. Taylor is a graduate of George Washington right here in D.C. so he wasn't unfamiliar with the surroundings, but he has been a great addition to Chambers and we loved having him and we loved getting to know his family, including his three children. After this he is going to go back across country because while D.C. was okay, apparently it wasn't that good. So he is going to go back to Gibson Dunn and back to California and we will miss him. Thank you. I concur. Well we all appreciate and we all have the pleasure of getting to work with not just our clerks but other clerks of this court and we enthusiastically grant Judge O'Malley's motion. Thank you. Please raise your right hand. In the name of the Son of the Spirit of the Father, the Holy Spirit, the Son of the Holy Spirit, Almighty God, who art in all things, hallowed be thy name, thy kingdom come, thy will be done, on earth as it is in heaven. Amen. Welcome to the Bar of the United States Court of Appeals. Thank you. Congratulations. The argued case today is 16-2438 Video Share vs. Google. Mr. Dovell, please whenever you are ready. Thank you, Your Honor. Good afternoon and may it please the court. The fundamental error of the district court below at Mayo Step 1 was in failing to recognize that the recited claims are directed to improving a technological process. That is, they are not directed to an abstract idea such as sharing video. They don't merely take sharing video and say let's do it on the internet. Rather, the claims are directed at improving the existing technological processes for sharing video on the internet. Now, happily, enough time has passed so that I think our circuit has come up with quite a few data points, which I hope is helpful to the public in terms of deciding what is or is not patent eligible. So I assume based on your comments that you would think that a case such as Anfish is the one that most squarely fits these. Is that correct or are there other cases that you would point us to that are most like the claims here? The case that is most like it is Bascom, but at that case they passed on Step 1 and went right to Step 2 in terms of the actual facts. In terms of Step 1, it's closest to McGrow and Anfish, the cases where the court has found claims patent eligible at Step 1. And maybe whether it's McGrow or Anfish, one of those two would be closest to Step 1. But didn't Anfish have very specific algorithms and technological methodology that were involved in the claims? Your Honor, Anfish did not have specific technological algorithms. By specific methods it did, and this claim does it well. The problem we're addressing here, Your Honor, is the problem of getting video from one computer over the internet to another computer. And there's a specific process that used to be used before we came along with our invention, and there's a specific process recited in our invention, and it contains numerous important steps. But the key, Your Honor, at Step 1 is not about those specific elements which will address the Step 2, but it's what does the claim purport to do? Are we merely saying, hey, let's share video and do it on the internet? Are we purporting to improve the technological process in the words of Alice? And here we very clearly are. In 1999... Well, we are. Why don't you be more specific? How? In the claims, Your Honor, let's take a look at 608 claim. We take a look at claim 1. The recited limitations were recited using a receiving computer to automatically convert the video file into a streaming video file, generate an identification tag comprising the video frame image, and then embedding the identification tag into a webpage. Those limitations recited an unconventional approach that was absolutely contrary to the conventional wisdom at the time. The paradigm at the time was, Your Honor, we're trying to transfer a whole video file from one computer to another video. The paradigm made use of traditional file transfer technology, attaching an email or posting on a webpage. This looked at it in an entirely different way. We're not going to be repeatedly transferring this video. Was it known to convert a video file into a video streaming file? That was known. Yes, it was. So if a particular user converted a video file on its computer to a video streaming file, I don't think you could say that's an inventive concept, could you? I would agree, Your Honor, and that's not what we point to. But because in your claim, your claim calls for the video file to be transmitted from the user computer to some, I don't know, receiving computer, and then the receiving computer does the conversion from the video file to a video streaming file, that makes all the difference? That's one of the things that makes the difference, Your Honor. Okay, well, let's focus on that one. I know you've got a couple of different reasons for saying you have an inventive concept, but I just want to first understand that one and make sure we kind of drill down on each one, one at a time, because if we talk about them all in one big basket very quickly, then I lose focus on what I'm supposed to be thinking about. Yes, Your Honor, I'm going to focus on the receiving computer, but I want to point out that the things I'm going to talk about, there's a synergy with other elements, so those other elements may come into the picture. Okay, but for now, just presume that the way I look at the claim, I see the claim as saying we have a video file at node A. The video file gets sent from node A to node B. At node B, the video file is converted to a different format. What am I missing from my understanding of the claim? One of the important elements, Your Honor, is that in the transmitting from node A to node B, we are transmitting over the Internet. We're transmitting over the same computer network that we're ultimately going to stream it from. That's required in both the 302 and the 608 claims. That is, it must be the same network for both, and because the streaming must be done from a web page, it must be on the Internet. And that means, Your Honor, conventionally, it was understood that if you're going to translate or transform your video, convert it to some other format that's better suitable for transmission, you do it before you start transmission. You don't transmit the video over the Internet, and then on the receiving end, convert it to streaming video. That was a completely new way to look at things, and it had never been done before. That sounds like you're actually creating a problem, right? By claiming an arrangement where you send the video file from node A to node B to allow node B to do the conversion, you're actually creating an unnecessary step when at node A you could have just simply done the conversion to a new format. Which is one of the reasons this was viewed as unconventional. This was inventive. It was not the way the conventional wisdom said to do it. Why is it inventive? Because, Your Honor, it was unconventional and contrary to the conventional wisdom. In other words, we know something's inventive if it was not really not done before, which is the case here. But it defied and turned upside down what was ordinarily done. So what problem does it solve? It solves three sorts of problems, Your Honor. Under the conventional processes, we're dealing with file transfer. At the receiving end, the entire file has to be downloaded before it can be used at all, before access can be started. By using streaming format, we eliminate that. Secondly, Your Honor, under conventional... But that was the prior art. That was already known. To convert something to a streaming format. Yes, it was. So, I mean, the advantage of being able to access a video through streaming format isn't something you invented. No, Your Honor. But remember, the prior art process of transferring a video file from one computer to another over the Internet consisted of either using email or using web posting. And it was not done in the prior art to put streaming video on... use it as web posting. That was not something that was known and used in the prior art. I'm sorry, I'm confused. Your claim, as I understand it, you have a thumbnail, right? A little picture of the video on a website. And then someone can, I guess, start streaming the video from that website, right? Yes, Your Honor. And then I thought I heard you say that it was conventional to stream from a website. No, Your Honor. I did not say that. Streaming technology was known, but it was used by content providers like real networks. They might stream a baseball game to users. But it was not conventional to stream from websites. It was not conventional to post... that's what our invention is about. It was not conventional to post streaming video on websites or to use thumbnails or any part of that. It was never known before it was not conventional. In fact, you will not find anything in the pleaded facts or the specification that says any part of that was conventional. Google doesn't point to anything. Didn't we say in Amdocs that just moving the location of one computerized activity from one... or moving a computerized activity from one location to another is not inventive? But that's not what was done here, Your Honor. We took the prior processes that were done on user computers and replaced them with a different process. We didn't centralize, hey, everybody's doing this on user computers, let's just move it over here. It's a completely new process. There was no conversion to streaming video and then generating an identification tag at this and then posting on a webpage. That wasn't done by users before. There's nothing in the record of the prior art that suggests that. Moreover, Your Honor, it would have been counterintuitive here. It depends on the problem you're dealing with. If it's counterintuitive to move it from one location to another, that becomes inventive. That's what makes something inventive. In this context, Your Honor, it was conventional for users, if they're going to do any kind of conversion, any kind of processing, to do it before you start transmission over the Internet. You don't do it and then have the receiving computer do it. In addition, Your Honor, let me spend just a few minutes talking about the thumbnail identifier. Again, the conventional approach was that our identifier is found inside of the file name. It's limited to the parameters of a file name. Why? Because that's what transfers with the file. Under conventional thinking, our identifier could consist of nothing more than alphanumeric characters and only a few of them, something that would fit in the file name. It was completely inconceivable that we could have an identifier that would be a still image because it wouldn't fit inside of the file name. That was our limitation. The administrator thought outside the box and said, Listen, we don't have to be limited to just the file name. We can create an entirely separate file, a still image file, link the two, and because we've got this central location now where we're sparking the video once, we can use that as our identifier. Just curious, why wouldn't that be regarded as the mere computerization of an old concept, which would be associating an image of a product with a product? Two reasons, Your Honor. Let's talk specifically about video. That's the closest comparison. That is, there was the practice of having DVD videos sold before. That's a film product, a video product. And in that practice, there was no limitation on your identifier field. Your identifier field was the front of the box. There's no limitation. You can put still images right on the box, color, black and white, along with alphanumeric codes. In addition, Your Honor, even for videos, it was not perceived as the best way to approach it, to put an image from the video. In fact, that was perceived as inferior, as second-rate. The vast majority of videos then and today, you can check this, you can go to the Best Buy website today, do not make use of an image from the video. Instead, they have graphic artists create a composite image. But can we just accept that it was known? It was known to do it. So now we're moving over to a website environment, the Internet environment. There's a file, a data file. The data file is being associated with some kind of identifier, i.e., a label. Labels can be alphanumeric. They can be also perhaps an icon or some kind of image. And you're saying, well, that would be very difficult to do, because perhaps it requires a lot of memory or something like that. At the same time here, what we have is just, in the claim, the concept of including a thumbnail image without explaining how you've managed to, I don't know, deal with any kind of memory restrictions or something like that in order to include such a thumbnail. So I'm at a little bit of a loss right now why the association of some kind of label, whether it be an image label or an alphanumeric label, all of a sudden creates an event of concept. Because, Your Honor, in the context of computer files at the time, the identifier was always limited to the parameters of the file name. It was the only identifier you could use for a file. This is about file identification. And that was the conventionalism. That was the perception. We can have whatever file identifier we want, as long as we can cram it into an alphanumeric set of bytes that fit within a file name. It took stepping outside the box, Your Honor, different thinking to say, wait a minute, we can do something different. We'll use an entirely separate file as our identifier. This is not really just we're going to associate products. It's about using this as the identifier for this video file. Nobody did thumbnails before on the Internet? Not for video, Your Honor. In fact, for the 608 patent, they did not identify a single bit of prior art where there was a video thumbnail image on a web page. But you can see thumbnails were running all over the place on the Internet. Thumbnails were your invention. It just so happened, in your view, there's no evidence of it associated with a video file. That's right, Your Honor. Thumbnails were solely used for still images. And the reason, Your Honor, is it was understood that if you've got a tiny picture of a still image, it can be really representative of that still image. It was not believed useful to use a still image of a selection from the video, particularly one selected by a third-party computer, that that would be at all useful in understanding what was on that video. That was not the conception at the time. That's why it was never done. In fact, Your Honor, you're not going to find that in the records and you're not going to take judicial notice of it. In fact, their expert even admitted on cross-examination that it would have been non-obvious to put a thumbnail image on a web page. I'll reserve the balance of my time. You have none left, but that's okay.  Thank you, Your Honor. Thank you. Good afternoon. May it please the Court. The district court lived with these claims for more than three years, held a market hearing, issued a claim construction order. And after all that, the court understood that... Did your experts acknowledge and admit that it would be non-obvious to associate a thumbnail image from a video with a video streaming file posted on a website? Your Honor, I have to confess I don't know what our experts said about that. This was decided on the pleading, so I haven't dug into the expert testimony on that subject. But I think it's acknowledged that the general idea of using a thumbnail, a still video frame image to represent the video, was well known as a conventional pre-internet practice. I'll give you the example and I'll read the image of Jimmy Stewart and Donna Reed from It's a Wonderful Life. That's 1946, and I don't think the idea was revolutionary even then. So this is just quintessential Alice taking an old, well-known idea, moving it into the internet environment without any technical details about how to implement it in that environment or solving any problem. In fact, VideoShare says in its brief that this actually created technical problems related to the bandwidth that was needed to transmit thumbnails. They didn't overcome any of those problems. So it's really a classic Alice situation, and you're actually... But they're saying that perhaps they created inventive concept by thinking outside the box to create a second file, i.e. the thumbnail, to associate with the first file, the video streaming file that no one had thought of before because everybody else was just reliant on the alphanumeric file name that was always associated with a given video file. Well, I think what they're saying is no one had used this particular pre-internet abstract idea on the internet or in the context of video streaming specifically. And I suppose in any one-on-one case modeled on Alice, you could make that claim. You could say no one had thought of doing intermediate settlement in the environment of the internet, and so we were thinking outside the box when we brought that idea into this environment. I think Alice tells us that's not enough. I think his point is that it's not so much saying no one thought of doing intermediate settlement on the internet, but he's saying that people were already doing video streaming on the internet, but there was a clear conventional way to do it that turned out not to be as good as what they came up with. Why isn't that BASCOM? I'll tell you why it's not BASCOM, and then I'll mention a few other cases that I think it's more like. So in BASCOM, there was actually a technical improvement in the way the computer or the network functioned. So the BASCOM claims took the pre-existing practice of content filtering, didn't just move it to a remote location, which the court said would not have been patent eligible. They added an additional feature that hadn't existed before, which was individual customizability. They used specific features, technical capabilities of certain networks to achieve that, and the court said that made the whole network more efficient. It made it run better, and this wasn't taking some pre-existing internet idea and just bringing it over into the context of the internet. It was actually improving the process with a new idea. I guess I'd point to something like the court's decision in Erie Indemnity, I think is a good example of what this is more like. There, the claims are directed to using an index to improve computer databases, and this was analogous to the kinds of indices that have been used in libraries to organize books and magazines. And so you could have said there, you know, yes, this was an old pre-existing idea of an index, but it wasn't being used in this particular environment to organize these kinds of databases, and so we actually improved it. The court didn't have any trouble with that. That said, you're just taking an old idea of an index, bringing it into this new technological environment. Same thing is going on here. You're taking an old idea of a thumbnail, bringing it into a new technological environment. But, you know, I understand that there's an overlap between 101 and 102 and 103, but at some point you seem to be shifting way into 103 analyses. I mean, you know, I get the notion that what is an abstract idea might be what you could do in your head or even maybe what you could do on paper. But when we get to the point of saying, well, you know, we're taking things that have been done on computers and then we say that what's being done on the computers at X point in time itself is abstract, not just putting it on a computer, not just a processor, I mean, then are we having a moving target with respect to what's abstract? Is something five years from now going to be abstract that wasn't abstract today? I don't know where the case laws have gone, but I think this court has done a pretty good job so far of drawing this line. It's true that there are sometimes overlap between the 101 analysis and the 102-103, and I think it's not always easy to draw that boundary. I don't think this is one of the hard 101 cases this court sometimes sees. I think you've got a very clear pre-Internet practice, and all the claims do is bring it into the Internet. You can imagine cases where somebody does more than that. They have actual technical, inventive innovation about how to bring that old idea into this new environment. But this thumbnail, use of the thumbnail, thumbnails wasn't a pre-Internet practice. Oh, sure it was, Your Honor. All a thumbnail is is taking a still image from the video and using it to represent the content of the video. That's exactly what was done with It's a Wonderful Life and a brief. Going back to basically as long as we've had video, movie studios, people selling these videos have pulled out a still image, put it on the box or the movie poster or what have you to represent the content of the video. If you walk through a video store, my friend says sometimes it's docketed a little bit. It's not the exact image. I don't know if that's true, but I think it's conceded that if you walk through a video store many years ago, back when they used to exist, you'd see a whole bunch of still images that were more or less taken from the video. So that's the same concept. It's absolutely a pre-Internet concept. This is what's said in Apple of the Amaranth. Just pointing to the degree of difficulty in implementing the abstract idea on the computer doesn't give rise to an inventive concept. You have to actually overcome the difficulty. So when they say, oh, this created technical challenges, that's not enough for an inventive concept. In fact, what that points to is that this patent is preempting anyone who actually solved those technical problems to the extent they existed. What about the transition of the format conversion from, I guess, the user's computer to this intermediary server that's going to be hosting a website? The other side is saying that was unconventional, that was something that people wouldn't think to do. People were thinking the opposite of doing that. So why isn't that an inventive concept? Sure, Your Honor. So all they're doing is offloading a particular generic computer function, video streaming, which we know is conventional. They're moving it from computer A to computer B. I think that's just routine conventional computer activity. This Court's case has made clear that just taking a known computer process and moving it. So maybe to echo Judge O'Malley here, why wouldn't that be a 103 notion? This would just be a routine thing to do, to do this file conversion from node A to node B. Isn't that a core 103 kind of an inquiry? Why is it also now a 101 inquiry? I think it might well be a 103 problem, too. Like I said, there's overlap here. But 101 is a coarser filter. It's trying to get at what did you really invent as opposed to what's just the conventional generic technological environment in which your invention is operating. Well, is it abstract? Is it an abstract idea to say that we're going to move this format conversion process from one location to another location? Is that an abstract idea? I'm not sure that's how I would put it. There's different ways to do this analysis in terms of what you do in step one and step two. I would say the abstract idea is the generic video streaming or the way the District Court put it, preparing the video for streaming. This is routine conventional Internet activity that's being tacked onto that. Of course, this court has invalidated lots of claims under 101 that included this element of transmitting or receiving data over the Internet as pre- or post-solution activity. When you look at a case like TLI Communications, the patents there were directed to the abstract idea of organizing and classifying digital images. But if you actually go back and look at what was claimed, it was a server, or you could call it a receiving computer, that received digital images over the Internet and then performed these steps of classifying and organizing. The court didn't have any trouble, didn't think that affected the analysis. It said sending and receiving data are basic computer functions that don't affect patent eligibility under 101. You can also look at the Symantec case. There you had conventional virus screening, just like you have conventional video streaming here. The claims took that generic virus screening activity and they moved it from a local computer to what they call the intermediary computer, or you might call it a receiving computer, on the telephone network. And the court said, you didn't actually change how the screening works. You didn't make it work any better. All you did is relocate from A to B. On E38F132021, I'll read you the language. I think it applies directly here. It says that the claims didn't recite any improvement to conventional virus screening software or solve any problems associated with situating such virus screening on the network. I'll say the exact same thing here. They didn't recite any improvement to video streaming and they didn't solve any problem by their own admission with situating an unreceiving computer. In fact, they created problems that they didn't overcome. I guess the other side is arguing that there must be some kind of distinct advantage in having this intermediate server with the website that's taking all these video files, automatically converting them to video streaming files, and then everybody on the network can then access from this one centralized server. Well, a few points about that, Your Honor. First, I think you're describing sort of a level of architecture that's not really in the claims. The claims just have two computers. The district court construed the phrase receiving computer at appendix 256 as one or more computers other than a second computer, at least one component of which receives a video file from a user on a second computer. So you've got computer A, computer B, and we're just offloading this generic function from one to the other. We're not solving any of the problems related to the technical complexity of streaming. We're just relocating them. So we're supposed to, at 101, we're supposed to do an analysis of whether any restructuring that they're doing actually is advantageous? Is this sort of a point of novelty kind of inquiry? I think the question is, are they providing a technological solution to a technological problem? And to the extent, you know, the technological problems they've identified, I mean, one is they say, you know, you had to get the whole file before you could watch it. That was not solved by video sharing. That was solved by the inventors of streaming. And then they point to the general technical complexity of streaming. And again, that may be a technological problem, but they didn't provide just moving that from A to B is not a technological solution. So, and, you know, coming back to you, Judge Chan, your question about, you know, what if you're making it easier for lots of people to use this? I mean, I think that's exactly the argument this court just rejected in the EasyWeb case, which, if it were precedential, I think would be directly controlling. It's not, but it's still quite persuasive. There, the claim described what they called a message publishing system. So the idea was you could send a message to the system by email or fax or phone. The system would receive it, automatically convert it, and publish it on the web for you. And it used conventional web publishing technology, but the claim was we've made this accessible to a broader range of people. The court had no problem with that. They said it's directed to the abstract idea of receiving and publishing content.  If, in fact, that we were to assume that there actually was a benefit, recoding, relocating the video processing from one location to the other, then would you be in Enfish or Bascom? Well, I guess, Your Honor, it would depend on what you thought the benefit was and whether it was a technological improvement to the functioning of the computer or the network. I don't know how you could get there here because I think it's acknowledged that the actual video streaming functions that are being performed on the receiving computer are the exact same functions that would have been performed on the first computer. So this is just like Symantec. It's a pure relocation without any improvement in functionality. So I don't know what problem. And if the problem is being solved is this was hard to do with computer A, so we took it away from computer A and gave it to computer B. Now it's hard to do with computer B. And I don't think you've solved the problem. You certainly haven't done it in a technological way. What about the user-to-user argument that you say that they waived? If they hadn't waived it, do you think that there would show some benefit or advantage from that? No, Your Honor. So again, I think that's very much like EasyWeb. It's this idea that there's this class of people they call users. I don't know exactly how you draw that line. But this class of people who weren't using the technology. Of course, the technology doesn't have to be universal to be conventional. But you've got some people who aren't using it. And we're essentially going to offer to do it for them. That's EasyWeb. And if you want to look beyond the computer context, it's a very old abstract idea. I mean, you could compare it to public access TV. I can't send out television broadcasts from my home. So I'll send you a video tape. You'll convert it into a broadcast signal and send it out over the airwaves. If that's just offering to perform a technical function for someone or an inventive concept, then you could have a follow-on patent for every new computer technology. You'd essentially say there's a second patent for offering to do it for someone who can't do it themselves. I don't think one-on-one permits that. Are there any more questions? Thank you. Your Honors, my friend has mistaken. The patent specification of the pleadings do not identify anywhere that at a user computer, our process was done, or any portion of it. That is, the process of converting to streaming format, then getting an identifier and putting that on a website, that was not done at a user computer before. What was done before, if you're going to transfer video, was to attach a file to an email, to post it on the web, or if you're a content provider, you might broadcast and stream video. But our process was not done before. So this is not a matter of taking a prior process and moving it. But it does seem a lot like data architecture restructuring. I mean, you're not saying, are you, that there's a huge advantage to having done this? Yes, Your Honor, the technological problems that we identified were solved because of this. Under the process before using email, for example, there was a tremendous problem of having to wait for downloads of video. Under the process before posting video, the same problem. It was virtually, it was very difficult to forward video. You would literally have to re-upload it and then have your other receiving computer, who you send it to, Party C, re-download it. But your friend on the other side says all you've done is take the difficulty of the front end and move that same difficulty to the back end. Why is that not true? Because there were multiple, there were two or three, arguably two or three different ways to do it before, but none of them combined what we did. And when you put all of ours together, you get synergistic benefits. Now, you can simply, instead of having to move video files all around the Internet every time you want to pull or remove them, you only have to move a link to that webpage. That's all you have to do. It saves tremendously in terms of bandwidth. In addition, Your Honor, the thumbnail identifier provides additional information that's useful and surprisingly useful and beneficial in identifying a set of videos on a webpage. Nobody expected that before. That was never done before. In addition, Your Honor, the problem of having users have to have, both at the receiving end and the transmitting end, particular bits of software components, technical components, those are eliminated. But there is a statement, and it's at JA55, where you say, it should be understood that any system, process, or capability that can be carried out on the user's computer can equally well be carried out on a host or receiving computer. Why doesn't that disclaim exactly what you were just saying, that relocating to a receiving computer improves something? It says the opposite, Your Honor. Let's take a look at the patent. Let's start with Appendix 48. That's where the summary of the invention is. I'm going to show you what precedes that statement, which is in Column 50. I want to show that, but I want to give you just a little background. In the summary of the invention, it describes the object of the invention in Column 1, and it started in Column 2 at Line 10. It begins to identify embodiments of the invention. The first embodiment is a method of sharing a video segment over a computer network, and so on. The network includes a receiving computer. Then it describes the steps that performs. Then in the rest of the summary of the invention, there are 15 variations in that. That is, every single variation in the summary of the invention uses this receiving computer or this host computer. Then when we go to the detailed description, which starts in line on Column 7 to 7, all the way through Column 15, that entire first seven columns of detailed description is exclusively about doing this invention on the host computer. All steps on the host computer. Then we get to Column 15 in the sentence that Your Honor records. That's at Column 15, Line 25, Appendix 55. What it says is any system, process, or capability that can be carried out on the user's computer in relation to the VideoShare producer software can equally well be carried out on a host computer. What it's saying is it's now going to talk about VideoShare software where some of the steps are done on the user computer and some on a server. It's saying that all those things can be done equally well on the receiving computer, the host computer, but it never says you can do everything equally well on the user computer. That would be disclaiming. So you're saying equally well means better? No, what it's saying is that the steps that we identified that are done on the user computer can be done equally well on the receiving computer, but there are additional benefits from putting it all on the receiving computer. And that's what's talked about in Columns 1 through 15 of the patent, right up to this point. In particular, it explains in the background of the invention that one of the issues was that there were technological components that were required at the user end and the receiving end. And then in the rest of the summary of the invention, in the first 15 columns, it explains the host computer eliminates those technological components, which is an enormous technological benefit. Eliminating technological components is, by definition, an improvement in a technological system. So as a result, when we get to Column 15, what we have is simply the statement that, by the way, now we're going to give you some things that can be done on the user computer, but please know, our host computer can do all those things. We don't ever see in the specification the opposite. It never asserts that we can do everything equally well on the user's computer. Never once. We won't find it anywhere in the pleadings or the specification. Unless there are any further questions, we'll see you later. Thank you. We'll move on to the slides. The case is submitted. That concludes our proceedings for this afternoon. All rise.